**UNITED STATES DISTRICT COURT**
**DISTRICT OF  MASSACHUSETTS**

| | |
|---|---|
| _____ ) | C.A. No. _____ |
| KINGDOM CHURCH, ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | |
| AMERICAN CAPITAL HOLDINGS, ) | |
| LLC, d/b/a JALIN CAPITAL REALTY ) | **COMPLAINT & DEMAND** |
| ADVISORS, LLC ) | **FOR JURY TRIAL** |
| ) | |
| & ) | |
| ) | |
| DAVID CHARLES JACKSON, a/k/a ) | |
| DAVID C. JACKSON, a/k/a, ) | |
| DAVID JACKSON, a/k/a ) | |
| CHARLES JACKSON, a/k/a/ ) | |
| C. DAVID MANNS, ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

**<u>Parties</u>**

1.      Plaintiff, Kingdom Church, is a non-profit religious organization/ corporation formed pursuant to the provisions of Chapter 180 of the Massachusetts General Laws and the location of its principal office is Brockton, Massachusetts.

2.      Defendant, American Capital Holdings, LLC ("American Capital" or collectively as "Defendants") describes itself as and is listed as a Pennsylvania Limited Liability Company with a principal place of business in Pittsburg, Pennsylvania, and at all relevant times was doing business as Jalin Realty Capital Advisors, LLC.

3.      Defendant, David Charles Jackson ("Defendant Jackson" or collectively as "Defendants") is the Managing Director of American Capital Holdings, LLC and presently resides in Pennsylvania or in Maryland.

4.      The Defendant Jackson is also known as David C. Jackson and has held himself out as David C. Jackson.

5.      The Defendant Jackson is also known as David Jackson and has held himself out as David Jackson.

6.      The Defendant Jackson is also known as Charles Jackson and has held himself out as Charles Jackson.

7.      The Defendant Jackson is also known as C. David Manns and at all relevant times he held himself out as and posed as C. David Manns of Jalin Capital Realty Advisors, LLC.

## Jurisdiction & Venue

8.      Jurisdiction over the subject matter of this civil action is proper in this Court pursuant to the relevant provisions of 28 U.S.C.A. §§ 1331, 1332 and 1441 where the matter involves federal questions and where there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs, and venue of this case is proper in this Court pursuant to 28 U.S.C. § 1391(a), (c).

**Statement of Facts**

9.      The Defendant Jackson is American Capital's Managing Director.

10.      Some years ago, the Defendant Jackson was the principal of Comvest Capital Mortgage & Investment Corps and First Capital Funding Group located at 100 Forbes Avenue, Pittsburg, Pennsylvania.

11.      On information and belief, for a number of years the Defendant Jackson used his position as principal of Comvest to assist in the perpetration of a mortgage loan fraud scheme along with three others, including an individual named Lavelle Sneed.

12.      On information and belief, sometime in 2005 the Defendant Jackson and three others, one the same Lavelle Sneed, were indicted and prosecuted in the United States District Court for the Western District of Pennsylvania in a federal criminal case named USA v. SNEAD, et al, and numbered 2:05-cr-000185.

13.      In that case the Defendant Jackson was indicted under the name David C. Jackson.

14.      On information and belief, the indictments described the Defendant Jackson as a mortgage broker who operated using the business name Comvest Capital Enterprises in Pittsburgh, Pennsylvania and that the Defendant Jackson's part in what was described as the loan fraud scheme was to request appraisals on some properties, using  a fraudulently inflated sales price which resulted in inflated appraised value and that the Defendant Jackson then applied for, or arranged for the straw purchasers, which included co-defendants and others.

15.     On information and belief, the Defendant Jackson's involvement in that loan fraud scheme caused him to be indicted on the offenses of bank fraud, wire fraud, money laundering and conspiracy.

16.     On information and belief, the Defendant Jackson resolved his involvement in that federal criminal case in October of 2006 through a plea agreement where the Defendant Jackson agreed to plead guilty to Counts 3 and 28 of the indictment, the offenses of bank fraud and money laundering.

17.     On information and belief, as a result of that plea agreement the Defendant Jackson was committed to the custody of the United States Bureau of Prisons for a total term of imprisonment of forty-one (41) months and that upon his release from imprisonment, the Defendant Jackson would be on supervised release for a term of five (5) years on Count 3 and three (3) years on Count 28.

18.     On information and belief, as part of the plea agreement the Defendant Jackson was ordered to pay restitution in the amount of $1,291,175.34 to five separate entities at a rate of not less than 10% of his gross monthly income.

19.     On information and belief, in July of 2006 just a few months before the Defendant Jackson began his term of imprisonment he alone or with the assistance of others including but not limited an individual named Victoria A. Tyus created the entity known as American Capital Holdings, LLC.

20.     On information and belief, on September 4, 2009, the Defendant Jackson was released from the custody of the United States Bureau of Prisons.

4

21.    On information and belief, on or around September 18, 2009 just weeks after the Defendant Jackson was released from custody, he alone or with the assistance of others including but not limited an individual named Anthony Byrd registered the trade name Jalin Capital Realty Advisors, LLC with the office of Ohio's Secretary of State.

22.    On information and belief, American Capital and the Defendant Jackson, alone or with the assistance of others including but not limited an individual named Anthony Byrd, devised a new scam referred to herein as the loan commitment scheme.

23.    On information and belief, American Capital and the Defendant Jackson's intended purpose of the loan commitment scheme was to defraud individuals and entities out of money through a complex design of misrepresentation and deceit, including but not limited to the fact that the Defendant Jackson would use the name of and hold himself out as a person named by the name of C. David Manns ("Manns")

24.    On information and belief, American Capital and the Defendant Jackson to perpetrate the loan commitment scheme had the Defendant Jackson pose as Manns and hold himself out as the operator of an entity named Jalin Realty Capital Advisors, LLC ("Jalin"), which maintained a website at www.jalinrca.com and claimed to be located at 2612 Needmore Road in Dayton, Ohio.

25.    On information and belief, American Capital and the Defendant Jackson to perpetrate the loan commitment scheme used the Defendant Jackson posing as Manns and used the internet and other means to among other things portray Jalin as company that was established in 2006 as a boutique hard money lender for commercial real estate and also a corespondent lender for multi-family transactions nationwide that Jalin's

5

acquisitions included apartments and hotels, retail and office buildings and that Jalin's philosophy, established track record and outstanding reputation help us to access the widest possible window to commercial real estate's dynamic marketplace.

26.    The text used to describe American Capital on its website at www.amcapitalholding.com is virtually identical to the text used to describe Jalin on what was formerly its website at www.jalinrca.com.

27.    On information and belief, American Capital and the Defendant Jackson to perpetrate the loan commitment scheme had the Defendant Jackson posing as Manns to portray Jalin as a company that had the resources, connections and track record to service the loan and financing needs of prospective borrowers, and that Jalin could do so with little delay.

28.    Neither American Capital nor the Defendant Jackson had any intention of servicing the loan and financing needs of prospective borrowers.

29.    On information and belief, to perpetrate the loan commitment scheme American Capital and the Defendant Jackson purposeful misrepresented their true identities, particularly that of the Defendant Jackson, to purposefully conceal the fact that prospective borrowers were actually seeking financing from and relying upon the representations of a recently released felon convicted of bank fraud and money laundering who owed in excess of one million dollars in restitution to various parties harmed by his illegal mortgage practices in his position at Comvest whose conditions of probation prohibited him from incurring new credit charges or obtaining additional lines of credit without the approval of his probation officer.

30.     On information and belief, to perpetrate the loan commitment scheme American Capital and the Defendant Jackson purposeful misrepresented their true identities, particularly that of the Defendant Jackson, to purposefully conceal the fact that prospective borrowers were actually wire transferring large sums of money per the instructions of a released felon convicted of bank fraud and money laundering who owed in excess of one million dollars in restitution to various parties harmed by his illegal mortgage practices in his position at Comvest whose conditions of probation prohibited him from incurring new credit charges or obtaining additional lines of credit without the approval of his probation officer.

31.     Kingdom Church was organized to teach the Gospel of Jesus Christ to address the material and spiritual needs of the Greater Boston Community by running housing and food assistance programs, drug court drug addiction counseling programs, Bible studies, and economic development projects for communities.

32.     Part of Kingdom Church's mission was to motivate believers, through worship activities, to be agents of change in the greater Boston area.

33.     Alexander D. Hurt ("Hurt") is the President of Kingdom Church and at all relevant times Hurt was acting in his capacity as President of Kingdom Church.

34.     During the fall of 2009, Kingdom Church was involved in the ongoing process of erecting a new church building where it intended to carry on its charitable purpose of serving the material and spiritual needs of the Greater Boston Community.

35.     Hurt, acting in his capacity as President of Kingdom Church, was involved in the process of erecting that new church building and one of Hurt's responsibilities was

to assure that Kingdom Church had the financing it needed to complete the new church building.

36.     Sometime around November or December of 2009 Hurt recognized that Kingdom Church's existing financing would not be sufficient to complete the construction of the new church building.

37.     Sometime in December of 2009 Hurt looked into alternative forms of financing and began to search for lenders and Hurt's search for lenders brought Kingdom Church into contact with Jalin.

38.     Jalin's website represented that "Jalin Realty Capital was established in 2006 as a boutique hard money lender for commercial Real Estate" and that they were "also a correspondent lender for multi-family transactions nationwide."

39.     Jalin's website also represented that "Jalin Realty Capital acquisitions include apartments & hotels, retail and office buildings" and that "Jalin Realty Capital's philosophy, established track record and outstanding reputation help us to access the widest possible window to commercial real estate's dynamic marketplace."

40.     Sometime in December of 2009 Kingdom Church, through Hurt, was put in contact with Jalin to discuss financing options so that Kingdom Church could complete the construction of the new church building and that initial contact was in the form of a phone conversation between Hurt and an individual who identified himself Manns who said that he ran a lending company called Jalin Realty Capital.

41.     Hurt was completely unaware that the person he was speaking with was, in fact, the Defendant Jackson of American Capital.

42.     During that same phone conversation Manns represented to Hurt that Jalin was a "hard money lender" and Manns represented that Jalin "could re-fi" Kingdom Church's "existing loan by using a Stand-by Letter of Credit that he could then use to secure a loan," a method that Manns assured Hurt that Manns had used to close many loans.

43.     During that same phone conversation Hurt explained to Manns that the needs of Kingdom Church were pretty dire and Manns assured Hurt that Jalin could complete the loan transaction in thirty days.

44.     Manns told Hurt that to complete this transaction for Kingdom Church that Manns and Jalin were working with some "heavy hitters" in the Real Estate business, including a person named Alan F. Daniels of Real Estate Capital Management and a person named Dhafir D. Dalaly of First International Exchange Group/Atlantic Bank.

45.     Manns represented to Hurt that Jalin had joined a transaction where Alan F. Daniels would secure a stand-by letter of credit ("SBLC") and Dhafir D. Dalaly's group would grant a loan against this SBLC.

46.     Manns represented to Hurt that Jalin and Alan F. Daniels would put up money to make such a transaction happen, and that Kingdom Church could join them for $225,000.00.

47.     Hurt and Kingdom Church relied upon the representations and assurances offered by Manns, particularly the fact that Dhafir D. Dalaly, whose group was purportedly affiliated with Atlantic Bank, would be acting as the lender.

48.     Shortly after that phone conversation between Hurt and Manns, Hurt received an email from an individual identified as Manns and in that email Manns explained to Hurt the information that Jalin needed to process the loan transaction and the timeline that Manns in completing the loan transaction.

49.     On or around January 25, 2010, Hurt received an email from Manns that had a document attached that Jalin had labeled as a "Term Offer Sheet" and it was through that document that Jalin first informed Kingdom Church that its loan application had received preliminary approval.

50.     That Term Offer Sheet was signed by Hurt on the behalf of Kingdom Church and by a person named Danna L. Sneed on the behalf of Jalin.

51.     Per the terms of the Term Offer Sheet Kingdom Church was to send Jalin $35,000.00 as an application fee, however, Hurt and Manns negotiated a lesser amount of $17,000.00 for the application fee.

52.     Manns directed Kingdom Church, specifically Hurt, to send Manns and Jalin the application fee in order to get the process started and Manns provided Hurt with instructions for the wire transfer, which included the details of the account that the funds should be transferred to.

53.     Manns provided Hurt with account information for a bank account that Manns claimed to be an account Jalin maintained, and, therefore, Hurt, acting on the Kingdom Church's behalf wire transferred $17,000.00 from its bank account in Massachusetts to the bank account for Jalin that Manns provided.

54.     On or around February 4, 2010, Manns alone or with the assistance of others drafted a written loan agreement ("loan agreement") where Jalin purported to

10

make a promise, or as Jalin termed it a "commitment" to provide Kingdom Church with financing.

55.    On or around February 4, 2010, Hurt received an email from Manns that had a document attached that was named loan commitment, which was a copy of the loan agreement.

56.    The loan agreement identified the lender as Jalin and the borrower as Kingdom Church and the terms of the loan agreement drafted by Manns included that the amount of the loan was "$16,000,000.00" or "$20,000,000.00" to be re-paid over a term of "Ten (10) years" and that the commitment fee was "completely refundable should the loan not close for any reason."

57.    In the section of loan agreement labeled "RETURN OF COMMITMENT FEE" Jalin agreed, among other things, that if Jalin "is unable to bring co-lenders into the transaction, or if [Jalin] does not perform its obligations under the terms of this commitment for whatever reason, [Jalin] shall only be obligated to refund the paid portion of the commitment fee, less compensation for time and expenses."

58.    On or around February 4, 2010, Manns also emailed Hurt a copy of a document labeled as   "ENGAGEMENT AGREEMENT" that Manns claimed to be an agreement where a company by the name of "Real Estate Capital Management, LLC" had agreed "to act as an investment bank to [Jalin] in connection with the procurement of up to $75 million in bank financing."

59.    On or around February 4, 2010, Manns also emailed Hurt a document dated "February 03, 2010" that Manns claimed to be letter from Manns on the behalf of

Jalin to a person named Viktor Bouquette, MD, President/CEO of E3 Technology, Inc. in Atlanta, Georgia where Manns referenced a recent telephone conversation with Viktor Bouquette and their "mutual understanding with Alan Daniels" and addressed Jalin "providing the necessary commitment fee to consummate funding transaction for E3 Technology, Inc."

60.     In that same letter Manns stated that Jalin's "funding bank will provide the funding secured by the credit enhancement provided by RECM" and in the next paragraph of that same letter Manns stated that "[i]n exchange for the services and commitment fee provided, it is agreed, that a portion of the proceeds will be allocated to Jalin Realty Capital Advisors, LLC to disburse utilizing the terms in the original security agreement to the following entities …," which included Kingdom Church.

61.     Around the same time Manns also emailed Hurt a copy of what Manns claimed to be communications between a person named Charles Marsh of T.U.J. Management Services in Beverly Hills, California and Viktor Bouquette, MD, President/ CEO of E3 Technology, Inc. in Atlanta, Georgia.

62.     Manns represented to Hurt that the communication between Charles Marsh and Viktor Bouquette was evidence of the commitment of the lender, Dhafir D. Dalaly of First International Exchange Group/Atlantic Bank, to the transaction contemplated by the parties' loan agreement.

63.     Manns also represented to Hurt that Charles Marsh of T.U.J. Management Services would be acting as a third-party escrow agent for the wire transfer of $225,000.00 commitment fee from Kingdom Church to Jalin.

64.     On or February 5, 2010, Manns sent emails to Hurt about the loan agreement and also about the instructions to have Kingdom Church wire monies to what Manns claimed to be the bank account of T.U.J. Management Services at a Citibank branch in Los Angeles, California.

65.     Manns represented that T.U.J Management Services would act as the escrow agent for all parties involved in the loan agreement between Jalin and Kingdom Church.

66.     On or around February 8, 2010, Hurt, relying upon the representations made by Manns and the promises made by Manns on the behalf of Jalin to Kingdom Church as part of their agreement or agreements, arranged to have the $225,000.00 wire transferred per the instructions given by Manns to the the bank account of T.U.J. Management Services at a Citibank in Los Angeles, California.

67.     On or around February 8, 2010, per Manns' instructions Kingdom Church with the assistance of a Massachusetts attorney wire transferred the $225,000.00 commitment fee from Kingdom Church's bank account in Massachusetts to the bank account of T.U.J. Management Services in California.

68.     On February 12, 2010, Manns sent Hurt emails where, among other things, Manns claimed to have heard from Alan F. Daniels whose organization was "verifying funds," that Manns had sent "bank coordinates and passports" to facilitate the transaction, and where Manns represented and assured that he did "not anticipate any problems" with obtaining funding per "our agreement."

69.     Sometime after February 12, 2010, Manns also emailed Hurt a copy of a document that Manns claimed to be a fax, dated February 19, 2010, from Charles Marsh of T.U.J. Management Services to Manns that included a letter that Manns claimed to have been sent to Viktor Bouquette of E3 Technology, Inc. by Dhafir D. Dalaly and that Manns represented to Hurt as proof that Jalin could complete the loan agreement and otherwise service Kingdom Church's financing needs.

70.     Also sometime after February 12, 2010 Manns communicated to Hurt that the transaction between Jalin, Alan F. Daniels and Dhafir D. Dalaly was to close near the end February of 2010.

71.     February of 2010 ended without any update from Manns or Jalin about the closing of the transaction between Jalin, Alan F. Daniels  and Dhafir D. Dalaly.

72.     Sometime in early March of 2010, Kingdom Church, through Hurt, tried to contact Manns for an update about the closing of the transaction between Jalin, Alan F. Daniels  and Dhafir D. Dalaly.

73.     After about three weeks of trying to reach Manns by phone, text, or email it was during the third week of March of 2010 that Hurt finally succeeded in reaching Manns and it was then that Kingdom Church received an update about the closing of the transaction between Jalin, Alan F. Daniels and Dhafir D. Dalaly.

74.     Manns acknowledged that Kingdom Church was the only entity or person to have provided Jalin with any monies in furtherance of the loan agreement between Jalin and Kingdom Church.

75.     Manns also acknowledged that neither Alan F. Daniels nor Dhafir D. Dalaly nor their respective organizations had provided Jalin any monies and that Jalin had failed to bring co-lenders into the transaction.

76.     When Hurt demanded that Manns and Jalin return Kingdom Church's money Manns told Hurt that Jalin was only a "shell" company and that Jalin no longer had the funds available to refund Kingdom Church's money.

77.     Manns told also Hurt that Jalin "had other deals that were close to completion and when they were completed he would give Kingdom Church its refund."

78.     Manns also told Hurt that "he was 100% sure that Dhafir D. Dalaly would give him a loan if he could find someone who could get Mr. Dalaly a SBLC to secure the loan" so Manns asked Hurt if he would look for a collateral provider while Manns sought to have Kingdom Church's money credited back to it.

79.     Jalin failed to complete any of the "other deals" that Manns told Hurt "were close to completion," a collateral provider was never found to allow Manns, Jalin or both to provide Dhafir D. Dalaly with the above-referenced SBLC, and neither Manns nor Jalin ever refunded or returned any portion of the $242,000.00 that Kingdom Church wire transferred to Jalin as part of the parties' loan agreement or loan agreements.

80.     In April of 2010, Kingdom Church's new church building project was foreclosed on.

81.     Sometime in October 2011, Hurt received a call from a number that he recognized as that used by Manns and when he answered the call Hurt recognized the voice of the caller as that of the person that Hurt knew as Manns.

82.     During that conversation, Manns explained that he was using the name Charles Jackson and he now represented to Hurt that he was now and had always been associated with company by the name of American Capital Holdings.

83.     When Hurt asked about the name change, the Defendant Jackson no longer holding himself out as Manns but now as Charles Jackson explained that Jackson was his family name and that he had recently reconnected with his father, and, therefore, chose to use the name Jackson.

84.     During that conversation, Hurt told Manns that he was in Uganda on the behalf of Dominion Christian Church and involved in a project that he hoped would provide financing work for missionary work both in the United States and abroad.

85.     The Defendant Jackson now holding himself out as Charles Jackson asked Hurt to get him involved in that venture, more specifically, he said to Hurt "don't leave me out."

86.     The events related to that interaction and venture are now the subject matter of a lawsuit pending in this Court, numbered 1:12-cv-10730, where American Capital filed suit in April of 2012 over what it describes as a joint venture agreements between it and Dominion Christian Church  ("joint venture lawsuit").

87.     In that joint venture lawsuit the verified complaint was signed by American Capital's managing director, David Charles Jackson, however, American Capital has identified Charles Jackson as the one person known to it to have information about its  joint venture lawsuit and it claims to maintain its principal place of business at

1151 Freeport Road, Suite 366 in Pittsburg, Pennsylvania and has identified its phone number as (888) 663-8195.

88.    Through the investigation that followed the filing of American Capital's joint venture lawsuit Kingdom Church has discovered that American Capital does not maintain an office at the address it provided and the account for American Capital's (888) 663-8195 phone number is listed in name of David Jackson of 432 Lynn Ann Drive, New Kensington, PA 15068, and the name David Jackson of 2530 Maple Avenue in Pittsburgh, Pennsylvania is listed on the Certificate of Organization for American Capital, and the that the only business located at 1151 Freeport Road in Pittsburg, Pennsylvania is UPS Store #2828.

89.    That in March of 2011 American Capital reported to the Better Business Bureau that the 1151 Freeport Road address it used was only a UPS mail drop and the business owner of American Capital reported that it had "a physical business location at 2612 Needmore Road in Dayton, OH 45412, which is the same address used Jalin.

90.    That American Capital has never been registered with the Ohio Secretary of State Division of Business and the trade name registration for Jalin was canceled on or around April 5, 2011.

91.    That according to the pleading in separate lawsuit filed by American Capital in the United States District Court for the Northern District of Texas that American Capital describes Jalin Realty Capital Advisors, LLC as American Capital's affiliate company.

92.     Through the investigation that followed the filing of American Capital's joint venture lawsuit Kingdom Church has discovered that the Defendant Jackson was formerly the principal of Comvest Capital Mortgage & Investment Corps and First Capital Funding Group located at 100 Forbes Avenue, Pittsburg, Pennsylvania.

93.     Through the investigation that followed the filing of American Capital's joint venture lawsuit Kingdom Church has also discovered that in addition to the Defendant Jackson there appears to have been a person by the name of Danna L. Jackson who worked with the Defendant Jackson at Comvest.

94.     That the name Danna L. Jackson is associated with numerous aliases and addresses, which include the name Danna L. Sneed and the addresses of 432 Lynn Ann Drive, New Kensington, Pennsylvania and 100 Forbes Avenue, Pittsburg, Pennsylvania.

95.     The name Danna L. Sneed is that used by the signatory to the term offer sheet between Kingdom Church and Jalin and it is also the name used by the signatory to the agreements that American Capital has based its joint venture lawsuit.

96.     Through the investigation that followed the filing of American Capital's joint venture lawsuit Kingdom Church has now discovered that the Defendant Jackson is the same David C. Jackson of Comvest who was indicted in federal criminal case described above and who later plead guilty to the offenses of bank fraud and money laundering.

97.     On information and belief, the Defendants falsely represented that Dhafir D. Dalaly of First International Exchange Group was an affiliate of Atlantic Bank.

98.     On information and belief, The Atlantic Bank was apparently never qualified or licensed to conduct business in the United States and was not legally affiliated with FIEC and was operating in the Islands of Nauru and Vanatu.

99.     On information and belief, on or around November 30, 2011, the State of Michigan Department of Licensing and Regulatory Affairs entered a Temporary Order to Cease and Desist requiring FIEG/Atlantic to immediately cease and desist from operating its website, www.Atlanticbankinc.com, and from conducting any and all business operations as First International Exchange Group, Inc., an affiliate of Atlantic Bank.

100.    The Defendants used the identity of C. David Manns and the trade name of Jalin Capital Realty Advisors, LLC to actively conceal from Kingdom Church the fact that Kingdom Church was unwittingly contracting to secure financing from American Capital and the Defendant Jackson.

101.    The Defendants purposeful misrepresentation of their true identity was an integral part of the Defendants' loan commitment scheme and deception used to defraud Kingdom Church where it allowed the Defendants to actively conceal the fact that Kingdom Church was unwittingly wire transferring monies to American Capital and the Defendant Jackson.

102.    The Defendants purposeful misrepresentation of their true identity, particularly that of the Defendant Jackson, was designed to keep from Kingdom Church the fact that it was seeking financing from and wire transferring money to a just recently released felon convicted of bank fraud and money laundering who owed in excess of one million dollars in restitution to various parties harmed by the Defendant Jackson's illegal

mortgage practices in his position at Comvest, and the fact that the Defendant Jackson's conditions of probation prohibited him from incurring new credit charges or obtaining additional lines of credit without the approval of his probation officer.

103.    Kingdom Church never would have entered into any agreements with Jalin or agreed to wire transfer any monies to Jalin per Manns' instruction if Kingdom Church was aware that it was in fact dealing with the Defendants, particularly the Defendant Jackson.

104.    The Defendants posing as Manns and Jalin used this misrepresentation of their identities to induce Kingdom Church to enter into agreements with Jalin and used the misrepresentation of Jalin's ability as a lender to service the financial and lending needs of Kingdom Church to induce Kingdom Church to enter into the agreements with Jalin.

105.    The Defendants posing as Manns and Jalin neither intended to loan nor otherwise service Kingdom Church's financial and never undertook any genuine efforts to bring in co-lenders as agreed by the parties.

106.    The Defendants posing as Manns and Jalin never intended to keep the promises they made to Kingdom Church through the agreements between Kingdom Church and Jalin, but instead the Defendants used the agreements between Kingdom Church and Jalin to perpetrate their loan commitment scheme, and, therefore, defraud monies from Kingdom Church.

107.     On information and belief, the actions, omissions and deception by the Defendants in furtherance of perpetrating the loan commitment scheme against Kingdom Church is but one instance of a pattern of activity by the Defendants.

108.     On information and belief, the Defendants successfully perpetrated their loan commitment scheme on a Minnesota company that also fell victim to the Defendants' misrepresentation of Jalin as a hard money lender that was established in 2006 as a boutique hard money lender for commercial real estate.

109.     On information and belief, the Defendants posing as Manns and Jalin and perhaps others were contacted by that Minnesota company, who was searching for financing for its business and that based on representations and inducements made by Defendants posing as Manns and Jalin and perhaps others that Minnesota company entered into a loan commitment agreement with Jalin unaware that it was, in fact, dealing with the Defendants.

110.     On information and belief, the written loan commitment agreement between Jalin and that Minnesota company is substantially the same, in all material respects, as the written loan commitment agreement between Jalin and Kingdom Church.

111.     On information and belief, the Defendants posing as Jalin and Manns and perhaps others, agreed to provide financing and to bring on co-lenders to facilitate a loan to the Minnesota company in exchange for a $37,500.00 commitment fee paid by the Minnesota company to Jalin.

112.     On information and belief, the Defendants posing as Jalin and Manns and perhaps others, purported to agree that the Minnesota company was entitled to a refund of

the commitment fee if Jalin failed to fund a loan or if Jalin was unable to bring co–lenders into commitment.

113.   On information and belief, the Defendants posing as Jalin and Manns and perhaps others instructed that Minnesota company to pay the $37,000.00 commitment fee to Jalin through a third party entity and that as instructed that Minnesota company unwittingly wire transferred $37,000.00 to the Defendants who then converted it for their own use.

114.   On information and belief, the Defendants posing as Jalin and Manns and perhaps others never intended to perform was Jalin purported to agree or to return any portion of that Minnesota company's money after it became apparent that Jalin failed to fund a loan or was unable to bring co–lenders into commitment.

115.   On information and belief, the Defendants posing as Jalin and Manns and perhaps others never intended to perform was Jalin purported to agree because the objective of their misrepresentations and deceit as not to service that Minnesota company's financial needs but to steal money through fraud.

116.   On information and belief, that Minnesota company also suspects that Jalin and/or its agents/representative appear to be involved with and potential perpetrating similar frauds at www.amcapitalholding.com, which is the website maintained by American Capital.

## Causes of Action

### COUNT I
### "Misrepresentation and Fraud 18 U.S.C. §§ 1341 & 1342"

117.    Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

118.    Defendants' falsely and fraudulently represented to Kingdom Church that they were capable of obtaining financing for Kingdom Church and would in good faith endeavor to do so.

119.    The parties entered into an agreements during January and February of 2010 confirming the Defendants' representations, promises and agreements to undertake certain obligations in furtherance of procuring financing for Kingdom Church.

120.    Defendants made these representations, promises and agreements to undertake certain obligations knowing them to be false.

121.    Defendants made such representations, promises and agreements to undertake certain obligations with the intent to defraud and deceive Kingdom Church with the intent to introduce Kingdom Church to reasonably rely thereon, including, without limitation, to cause Kingdom Church to wire transfer monies to the Defendants.

122.    At the time the Defendants made such representations, promises and agreements to undertake certain obligations the Defendants knew them to be false and had no intention of performing them.

123.    At no time did the Defendants have the intent or means or ability to fund, loan or meet their obligations under the parties' agreements.

124.     The Defendants' fraudulent and materials misrepresentations to Kingdom Church were reasonably relied up by Kingdom Church, to its detriment, and as a result Kingdom Church has been damaged.

125.     In doing the acts herein alleged the Defendants acted with oppression, fraud, and malice, and, therefore Kingdom Church is entitled to damages.

**COUNT II**
**"Civil R.I.C.O. 18 U.S.C. §§ 1961-1964"**

126.     Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

127.     Defendants, by and through their agents and representatives, engaged in a criminal enterprise.

128.     Namely, the Defendants have engaged in a pattern and practice of racketeering activity across state lines, and a conspiracy to engage in racketeering activity involving numerous R.I.C.O. predicate acts against Kingdom Church and its agents and representatives.

129.     Defendants did acquire and/or maintain, directly or indirectly, an interest in or control of a R.I.C.O. enterprise of individuals who were associated in fact and who did engage in, and whose activity did affect, interstate and foreign commerce, all in violation of 18 U.S.C. § 1961(1)(A) and (B), and the Defendants did so in violation of R.I.C.O. law under 18 U.S.C. § 1962(b).

130.     Defendants offenses were calculated and premeditated with the primary objective being to inflict severe and sustained economic hardship upon Kingdom Church.

131.    Without limitation, evidence of the Defendants' pattern and practice of racketeering activity and conspiracy to engage in racketeering activity is evidenced by their nearly identical conduct with the Minnesota company described herein.

132.    In doing the acts herein alleged the Defendants acted with oppression, fraud, in malice, and, therefore Kingdom Church is entitled to damages.

133.    As a direct result of the Defendants' criminal enterprise, Kingdom Church has suffered damages and is entitled to, without limitation, actual damages, recruitment of any games, profits, or advantages attributable to the Defendants' violation of the relevant provisions of R.I.C.O. law, and treble damages under the authority of, without limitation, 18 U.S.C. § 1984(c).

## COUNT III
### "Massachusetts Consumer Protection Act, M.G.L. c. 93 A, § 9"

134.    Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

135.    The Defendants neither maintain a place of business nor maintain assets in Massachusetts.

136.    At all relevant times Kingdom Church was a person, other than a person entitled to bring action under section eleven of M.G.L. c. 93A.

137.    At all relevant times the Defendants were engaged in the conduct of trade and commerce within the meaning of M.G.L. c. 93A.

138.    As described herein, the Defendants acts and omission including, without limitation, the fraudulent and materials misrepresentations that the Defendants made to

deceive and defraud Kingdom Church constitute unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of M.G.L. c. 93A.

139.   Defendants' unfair, deceptive and wrongful acts occurred primarily and substantially within the Commonwealth, and were conducted knowingly and willfully by the Defendants to deceive and defraud Kingdom Church.

140.   Defendants' unfair, deceptive and wrongful acts have caused Kingdom Church to suffer damages, and, therefore, Kingdom Church is entitled to judgment against Defendants for damages, doubled or trebled, costs, fees, attorney fees and interest.

## COUNT IV
### "Massachusetts Consumer Protection Act, M.G.L. c. 93 A, § 11"

141.   Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

142.   The Defendants neither maintain a place of business nor maintain assets in Massachusetts.

143.   At all relevant times Kingdom Church was engaged in the conduct of trade and commerce within the meaning of M.G.L. c. 93A.

144.   At all relevant times the Defendants were engaged in the conduct of trade and commerce within the meaning of M.G.L. c. 93A.

145.   As described herein, the Defendants acts and omission including, without limitation, the fraudulent and material misrepresentations that the Defendants made to

deceive and defraud Kingdom Church constitute unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of M.G.L. c. 93A.

146.    Defendants' unfair, deceptive and wrongful acts occurred primarily and substantially within the Commonwealth, and were conducted knowingly and willfully by the Defendants to deceive and defraud Kingdom Church.

147.    Defendants' unfair, deceptive and wrongful acts have caused Kingdom Church to suffer damages, and, therefore, Kingdom Church is entitled to judgment against Defendants for damages, doubled or trebled, costs, fees, attorney fees and interest.

## COUNT V
## "Breach of Contract"

148.    Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

149.    Kingdom Church performed all of its promises and elements as required under the parties' agreements, including, without limitation, transferring to the Defendants a $17,000.00 loan processing fee and a $225,000.00 loan commitment fee.

150.    At no time did the Defendants have the intent or means or ability to fund, loan or meet their obligations under the parties' agreements.

151.    Defendants made no reasonable attempt to comply with their promises and obligations under the parties' agreements, including failing to conduct any required or necessary due processing, underwriting or due diligence.

152.   Defendants failed to refund or return any portion of the monies that Kingdom Church wire transferred to Defendants under the parties' agreements.

153.   Defendants willfully and maliciously converted the monies that Kingdom Church wire transferred to Defendants for their own use.   As a direct result of the Defendants' theft and intentional, knowing and fraudulent breach of the parties' agreements, Kingdom Church has suffered damages.

## COUNT VI
### "Misrepresentations, Fraud & Deceit"

154.   Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

155.   Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

156.   Defendants' falsely and fraudulently represented to Kingdom Church that they were capable of obtaining financing for Kingdom Church and would in good faith endeavor to do so.

157.   The parties entered into an agreements during January and February of 2010 confirming the Defendants' representations, promises and agreements to undertake certain obligations in furtherance of procuring financing for Kingdom Church.

158.   Defendants made these representations, promises and agreements to undertake certain obligations knowing them to be false.

159.   Defendants made such representations, promises and agreements to undertake certain obligations with the intent to defraud and deceive Kingdom Church

with the intent to introduce Kingdom Church to reasonably rely thereon, including, without limitation, to cause Kingdom Church to wire transfer monies to the Defendants.

160.    At the time the Defendants made such representations, promises and agreements to undertake certain obligations the Defendants  knew them to be false and had no intention of performing them.

161.    At no time did the Defendants have the intent or means or ability to fund, loan or meet their obligations under the parties' agreements.

162.    The Defendants' fraudulent and materials misrepresentations to Kingdom Church were reasonably relied up by Kingdom Church, to its detriment, and as a result Kingdom Church has been damaged.

163.    In doing the acts herein alleged the Defendants acted with oppression, fraud, and malice, and, therefore Kingdom Church is entitled to damages including, without limitation, special damages, costs, fees and interest.

## COUNT VII
## "Conversion"

164.    Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

165.    Defendants' knowingly and willingly took the monies that Kingdom Church wire transferred to the Defendants and converted the same for their own use.

166.    Kingdom Church has demanded return of the monies that it wired transferred to the Defendants, including but not limited to the commitment fee, but the

Defendants willfully failed and refused, and continue to fail and refuse, to return any of the monies that Kingdom Church wire transferred to the Defendants.

167.    As a proximate result of the Defendants' conversion, Kingdom Church has suffered damages that are the natural, reasonable, and proximate results of the Defendants' conversion.

168.    Kingdom Church has been forced to expend additional time and money in pursuit of the converted property and Kingdom Church will continue to incur additional damages due to the Defendants' conversion.

169.    Defendants acts of conversion were willful, wanton, malicious, and oppressive, and were undertaken with the intent to defraud.

## COUNT VIII
### "Unjust Enrichment"

170.    Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

171.    Defendants have been unjustly enriched as a result of the actions complained of herein and should not be permitted to retain any of the monies that Kingdom Church wire transferred to the Defendants, including but not limited to the $225,000.00  commitment fee that Kingdom Church wire transferred to the Defendants.

172.    Defendants failed to provide any of the services for which Kingdom Church wire transferred the commitment fee and other monies to the Defendants.

173.    Kingdom Church has been materially damaged by the Defendants' actions.

## COUNT IX
### "Breach of Covenant of Good Faith and Fair Dealing"

174.   Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

175.   The parties entered into an agreements during January and February of 2010 confirming the Defendants' representations, promises and agreements to undertake certain obligations in furtherance of procuring financing for Kingdom Church.

176.   By entering said agreements it was expected that the parties, including the Defendants, were required to remain faithful to the intended and agreed expectations of the parties in their performance.

177.   Kingdom Church fully performed its promises under parties agreements, however, the Defendants wholly failed to perform as they had represented, promised and agreed.

178.   Defendant' failure to perform as they had represented, promised and agreed has caused damages to Kingdom Church for which Defendants are liable.

## COUNT X
### "Promissory Estoppel"

179.   Kingdom Church re-states and re-alleges each and every allegation set forth above and thereby incorporates the same by reference as if fully set forth herein.

180.   Defendants made representations, promises and agreements to undertake certain obligations in furtherance of procuring financing for Kingdom Church, which the Defendants neither intended to be true nor intended to be undertaken.

181.    Kingdom Church reasonably relied upon the Defendants' representations, promises and agreements, to Kingdom Church's detriment, and, therefore, Kingdom Church has suffered damages.

## **Prayer for Relief**

182.    WHEREFORE, the Plaintiff, Kingdom Church, prays for judgment in its favor and against the Defendants, American Capital Holdings, LLC and David Charles Jackson, as follows:

a.    Granting judgment in Plaintiff's favor on its claims against Defendants including, without limitation, actual damages, recruitment of any gains, profits, or advantages attributable to the Defendants' tortious and fraudulent violations of the relevant provisions of R.I.C.O. law, and treble damages under the authority of, without limitation, 18 U.S.C. § 1984(c), and special damages, doubled or trebled under the authority of, without limitation,  M.G.L. c. 93A and the law of the Commonwealth of Massachusetts;

b.    Plaintiff's costs, attorneys fees and interest under the authority of, without limitation, M.G.L. c. 93A, the law of the Commonwealth of Massachusetts and federal law, together with pre-judgment interest, and;

c.    Such further relief as this Honorable Court deems just and proper under the circumstances of this civil action.

**<u>Jury Demand</u>**

Kingdom Church demands a trial by jury as to all claims so triable.

> Respectfully submitted,
> KINGDOM CHURCH
> By its attorney,
>
> <u>/s/David F. Segadelli</u>
> David F. Segadelli, Esq.
> BBO# 661670
> Law Offices of
> David F. Segadelli
> 40 Warren Street
> Charlestown, MA 02129
> Ph: 617-532-0966
> david@segadellilaw.com

DATED:        February 22, 2013.